**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Arthur Williams,<br><br>                                    Plaintiff,<br><br>                    -v-<br><br>East Meadow Union Free School District,<br>Dr. Kenneth Card, *in his individual capacity*, and<br>Dr. Patrick Pizzo, *in his individual capacity*,<br><br>                                    Defendants. | 2:21-cv-3310<br>(NJC) (JMW) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Arthur Williams commenced this action on June 11, 2021. At a hearing on March 9, 2026, and in a written order on March 12, 2026, I granted in part and denied in part Defendants' Motion for Summary Judgment. (Min. Entry & Order, Mar. 9, 2026; Mem. & Order, ECF No. 83.) Williams' claims for disparate treatment on the basis of race under 42 U.S.C. § 1983 ("Section 1983") and Title VII, 42 U.S.C. § 200e-2(a)(1) ("Title VII") against Defendants East Meadow Union Free School District, District Superintendent Kenneth Card, and Patrick Pizzo (together "Defendants"), and for hostile work environment under Section 1983 against Pizzo are proceeding to trial. (Mem. & Order.)[1] These claims arise from Defendants' actions relating to the termination of Williams from the role as the District's Assistant to the

---

[1] Consistent with the caption of this Opinion and Order, the Clerk of Court is respectfully directed to update the case caption to reflect the dismissal of Defendants Scott Eckers, Alisa Baroukh, Elaine Napolitano, Joseph Parisi, Marcee Rubenstein, and Melissa Tell from this action as well as the dismissal of the official capacity claims against Defendants Kenneth Card and Patrick Pizzo. (*See* Mem. & Order, ECT No. 83.)

Superintendent for Administration and Special Projects ("Facilities Director") and from Pizzo's treatment of Williams while he served in that role. Before the Court is Defendants' Motion to Preclude the Expert Testimony of Dr. Darlene Garlington, Williams' proffered expert psychologist ("Motion to Preclude"). (Mem. L. Supp. Mot. Preclude Pl.'s Expert Garlington ("Mot."), ECF No. 77-9.) Defendants seek to preclude Dr. Garlington from offering at trial her opinions that Williams suffers from post-traumatic stress disorder ("PTSD") and major depressive disorder ("MDD") and that the alleged racial discrimination and harassment that Williams experienced as Facilities Director caused him to develop these conditions and other psychological and emotional injuries. Williams opposes the Motion. (Mem. Opp'n Mot. Preclude Pl.'s Expert Garlington ("Opp'n"), ECF No. 77-10.) The parties do not dispute that Dr. Garlington is qualified to serve as an expert in clinical psychology, although neither her curriculum vitae nor basic information about her education and qualifications are in the record before the Court on Defendant's Motion to Preclude. The parties' dispute centers on whether the opinions set forth in Dr. Garlington's expert report, which was disclosed under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P"), are supported by sufficient facts and data and result from the application of reliable principles and methods as required under Rule 702 of the Federal Rules of Evidence ("Fed. R. Ev.").

For the reasons set forth below, Williams is precluded from offering testimony from Dr. Garlington on any subject other than her administration of eight psychological tests to Williams, her findings as to the results of each test, and limited testimony regarding Williams' responses to test questions to lay the foundation for her opinion that Williams exhibited symptoms of depression, anxiety, somatization, and cognitive distortions. Accordingly, pending this Court's determination that Dr. Garlington is qualified to serve as an expert in clinical psychology, Dr.

2

Garlington may be called to testify at trial regarding her opinions, based on these test results, that Williams exhibited symptoms of depression, anxiety, somatization, and cognitive distortions at the time of her 2024 examination. However, under various subsections of Rule 702, Dr. Garlington is precluded from testifying at trial about any opinions concerning the cause of those symptoms, whether the symptoms were indicative of underlying trauma, and her diagnosis that Williams suffers from PTSD and MDD. Dr. Garlington did not rely on reliable principles and methods in reaching these opinions as required by Rule 702(c), and her expert report and deposition testimony fail to provide sufficient information to show that these opinions are the result of her application of reliable principles or methods as required by Rule 702(d). Additionally, Dr. Garlington's opinions regarding the causes of Williams' psychological and emotional injuries are precluded because they are not based on sufficient data or evidence as required by Rule 702(b).

### BACKGROUND

The facts set forth in the Court's March 12, 2026 Memorandum and Order granting in part and denying in part Defendants' Motion for Summary Judgment are adopted by reference and fully incorporated. (ECF No. 83.) Additional facts are taken from the parties' factual submissions on the Motion to Preclude.

Dr. Darlene Garlington, Williams' proffered expert witness, is a licensed clinical psychologist in private practice in Baldwin, New York. (Psychological Evaluation & Clinical Interview ("Garlington Rpt.") at 12, ECF No. 77-12.)[2] Although her report indicates that a

---

[2] Excerpts from Dr. Garlington's report and from the parties' submissions are reproduced here exactly as they appear in the original documents. Errors in spelling, punctuation, or grammar will not be corrected or noted.

curriculum vitae is attached, it does not appear within the document filed by Williams at ECF No. 77-12. (*See id.* at 12.) She testified in deposition that she has more than forty years of experience working as a licensed clinical psychologist and "specialize[s] in trauma" but treats people "mainly with anxiety, depression." (Garlington Dep. 12:3–16, ECF No. 77-13.) When asked if she had ever done research on the psychological effects of racism and harassment in the workplace, Dr. Garlington testified that she had never done any empirical research on the topic but had done "more anecdotal [work] with Anderson Cooper . . . looking at racism and bias." (*Id.* 172:9–16.) She also testified that her dissertation "was based on racial identity," her "[f]irst book was on that," and she "did a lot of workshops" on "these issues." (*Id.* 172:20–173:9.) However, Dr. Garlington did not explain what any of this work entailed or what she meant by stating that her dissertation was on "racial identity."

On July 2, 2024, Dr. Garlington conducted a four or six-hour psychological clinical interview of Williams and administered eight psychological tests to him: the Beck Depression Inventory, the Beck Hopelessness Scale, the Beck Anxiety Inventory, the Brief Symptom Inventory, the Symptom Checklist-90-Revised, the Quality of Life Inventory, the Generalized Self-Efficacy Scale, and the Cognitive Distortion Scales. (Garlington Rpt. at 6–7; Garlington Dep. 26:2–8, 27:20–28:4.) Dr. Garlington also had an approximately twenty-minute follow up call with Williams on or around July 5, 2024. (Garlington Dep. 26:4–28:5.)

As set forth in her expert report, Dr. Garlington reached the following opinions:

(1) she diagnosed Williams with Post-Traumatic Stress Disorder ("PTSD"), "unspecified," which she opined is a "disease of non-recovery";

(2) she diagnosed him with Major Depressive Disorder ("MDD"), "single episode, severe w/o psychotic features";

4

(3) she found that the psychological tests she administered to Williams revealed "psychological distress, particularly in the areas of depression, anxiety, somatization, and cognitive distortions";[3]

(4) she opined that Williams developed PTSD with co-occurring depression and anxiety "as a direct result of his interactions experienced at East Meadow School District., especially by Mr. Pizzo, and the discrimination and hostile work environment that he was subjected to on a regular basis"; and

(5) she recommended that Williams receive specialized psychological treatment with an emphasis on trauma-focused therapies.

(Garlington Rpt. at 5, 10–11.)

Dr. Garlington's report indicates that she relied upon criteria set forth in the International Classification of Disease 10 ("ICD-10"), although she testified in deposition that she actually relied upon the criteria set forth in the International Classification of Disease 11 ("ICD-11"). (*See* Garlington Rpt. at 10; Garlington Dep. 194:14–17, 212:16–213:11.) Dr. Garlington explained that she does not "type [her] own records" so, although the ICD-11 "is what [she] had in [her] office," the report mistakenly refers to the ICD-10. (Garlington Dep. 213:4–14.) As a result, for purposes of this Opinion, I treat the references to ICD-10 in Dr. Garlington's report as typographical errors and understand them to concern the diagnostic criteria set forth in the ICD-11.

Dr. Garlington testified that the ICD-11 is one of two "diagnostic manuals that every provider uses to diagnose" psychological conditions. (*Id.* 194:14–17.) For a PTSD diagnosis, the ICD-11 requires the presence of four criteria labeled "A," "B," "C," and "D" and that Criteria B, C, and D "must all be met within 6 months of the stressful event or at the end of a period of

---

[3] According to Dr. Garlington's report, there are five types of cognitive distortions: self-criticism, helplessness, hopelessness, self-blame, and preoccupation with danger. (Garlington Rpt. at 7.) Somatization refers to the "distress caused by the body's expression of stress." (*Id.* at 6.)

5

stress." (Garlington Rpt. at 10–11.) Pertinent to the motion before this Court, Criterion D can be

met when a person displays either:

(1) "Inability to recall, either partially or completely, some important aspects of the period of exposure to the stressor"; or

(2) "Persistent symptoms of increased psychological sensitivity and arousal . . . shown by any two of the following": (a) "Difficulty in falling or staying asleep"; (b) "Irritability or outbursts of anger"; (c) "Difficulty in concentrating"; or (d) "Exaggerated startle response."

*Id.*[4]

Dr. Garlington's report does not explain what information gleaned from her interview of

Williams or each of the eight tests satisfy any of the ICD-11 criteria for PTSD. (*See* Garlington

Rpt. at 11–12.) Nor does it state which prong of PTSD Criterion D was met by Williams, or

whether Dr. Garlington concluded that he exhibited any particular symptoms that met PTSD

Criteria B, C, and D in the first six months after the alleged stressful event or period of stress or

the basis for any such conclusion. (*Id.*) Dr. Garlington provided limited testimony as to how she

made the PTSD diagnosis in her deposition, although portions of this testimony are conclusory,

difficult to follow, and do not clarify what specific facts or data support the finding that each of

---

[4] The other three PTSD criteria set forth in the ICD-11 are as follows: (A) the patient was exposed to a "stressful event or situation (either brief or longlasting) of exceptionally threatening or catastrophic nature, which would be likely to cause pervasive distress in almost anyone"; (B) the patient experiences "persistent remembering or 'reliving of the stressor in intrusive 'flashbacks,' vivid memories, or recurring dreaming, or in experiencing distress when exposed to circumstances resembling or associated with the stressor"; and (C) the patient exhibits an "actual or preferred avoidance of circumstances resembling or associated with the stressor which was not present before exposure." (Garlington Rpt. at 10.)

the PTSD criteria is satisfied. (*See* Garlington Dep. 201:17–202:19.)[5] Finally, the report does not set forth the criteria on which she relied to diagnose Williams with MDD or how she applied any such criteria to the facts or data before her, including her examination of Williams and his test results. (*See* Garlington Rpt. at 10–11.)

The report sets forth Dr. Garlington's observations of Williams' behavior, the determination that he exhibited symptoms of anxiety, somatization, and cognitive distortions, the results of eight psychological tests administered to him, and her recommendation that Williams "would benefit from evidence-based psychotherapy focused on trauma, particularly Cognitive Processing Therapy (CPT)." (*Id.* at 3–10, 12.) It also indicates that Dr. Garlington reviewed the

---

[5] The entirety of Dr. Garlington's testimony as to her application of PTSD Criteria B, C, and D was as follows:

Q. What did Mr. Williams tell you that caused you to conclude that he met Criteria B for PTSD?

A. Primarily the flashbacks and even the possibility, I'm not sure of displacement of those flashbacks. hypervigilance, which he avoided.

Q. What did Mr. Williams tell you that caused you to conclude that he—well, did you conclude that he satisfied Criteria C for PTSD?

A. Absolutely. He wanted to avoid anything that resembled or triggered him around what had occurred.

Q. What about Criteria D . . . ?

A. Yes, it is something you challenged me on, his inability to recall at times and his inconsistent presentation of what happened.

Q. Did you attribute his inability to recall to PTSD?

A. Along with the other symptoms, yes, not in isolation but along with the other symptoms of his presentation, yes.

(Garlington Dep. 201:17–202:19.)

7

following materials submitted by Williams' counsel: (1) the Complaint in this action; (2) Williams' complaint to the New York State Division of Human Rights; (3) the transcripts of the depositions of Williams, Card, Pizzo, former District Superintendent Leon Campo, and District Board Member Matthew Melnick; and (4) an affidavit by Campo. (*Id.* at 1.) According to the report, in reaching her opinions, Dr. Garlington relied upon Williams' responses to her questions during the clinical examination and her observations of Williams, including her observation that Williams paused mid-sentence and at times struggled to remember recent events, such as details of the racial discrimination and harassment that he alleges to have experienced while working for the District. (*Id.* at 3; *see also* Opp'n at 3 (acknowledging the same); Mot. at 9 (same).)

Prior to reaching the opinions set forth in her report, Dr. Garlington did not review—and counsel for Williams did not provide her—any of Williams' medical or counseling records, including records relating to past therapy treatment and the evaluation and diagnosis of dementia, or testimony by Williams' family members regarding such issues. (*See* Garlington Dep. 33:8–34:16, 37:10–13, 128:21–129:14; 132:23–133:9; Marilyn Williams Dep. 45:4–48:18, ECF No. 54-46.) However, Dr. Garlington recognized in her report that Williams "reported attending 'a few virtual sessions, less than fifteen' with a psychologist, Dr. Monroe . . . focusing on workplace trauma," thereby showing her awareness that Williams was treated by a psychologist after the alleged discrimination and harassment and before her own evaluation in 2024. (Garlington Rpt. at 5.) Williams' current counsel referred him to Dr. Monroe, who initially diagnosed Williams with mild depression and later updated that diagnosis to moderate depression. (Monroe Dep. 17:8–10, 129:14–25, ECF No. 77-2.) However, there is no record that Dr. Monroe ever diagnosed Williams with PTSD or MDD. (Mot. at 3.)

The report does not address treatment that Williams received on June 21, 2022 from his treating neurologist, Dr. Abraham Glasman, or on August 11, 2022 from Dr. Christine Weber, a neuropsychologist. (Glassman Dep. 14:9–16, ECF No. 77-4; Neuropsychological Consultation Report ("Weber Rpt.") at 1, ECF no. 77-4.) Dr. Weber diagnosed Williams with "[u]nspecified dementia with behavioral disturbance" and produced a report in which she found that the dementia was mild and the symptoms had been "gradual for the past three years with a more advanced progression the past seven months." (Weber Rpt. at 5.) Dr. Weber concluded that Williams' "executive functioning varied from being extremely low to average," that his memory "varied from being extremely low to average," and that he "reported primary deficits in memory being forgetful" but "did not report any significant depression, anxiety, and/or hopelessness on self-report measures." (*Id.* at 2–3, 5; *cf. id.* at 3 (recording that Williams' self-report measures were indicative of "minimal depression," "minimal anxiety," and "0 points on a self-report measure of hopelessness").) According to progress notes written in medical records relating to Weber's treatment of Williams on August 11, 2022, Williams' wife reported that he exhibited "changes in his personality being more irritable," which Dr. Weber attributed to his memory issues. (*Id.* at 1.) Williams did not report any sleep difficulties or hallucinations. (*Id.* at 1.)

## LEGAL STANDARDS

Rule 702 governs the admissibility of expert testimony. The Supreme Court has made clear that the district court has a gatekeeping function under Rule 702: it is charged with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).[6]

---

[6] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

9

First, expert testimony, like other evidence, is relevant under Rule 401, Fed. R. Evid., where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024).

Second, to determine whether expert testimony has a sufficiently reliable foundation to be admissible at trial, a court must consider the "indicia of reliability identified in [Rule] 702." *Clerveaux v. East Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 (2d Cir. 2021). Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[7] Thus, the Court must determine whether: (1) the proposed expert is sufficiently qualified to testify about the proposed subject matter; (2) the expert's testimony is

---

[7] Rule 702 was amended effective December 1, 2023. "Nothing in the amendment imposes any new, specific procedures." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments. Instead, one purpose of the amendment was to emphasize that:

> [j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

reliable; and (3) testimony about the proposed subject matter will assist the trier of fact. *See*

*Nimely v. City of New York*, 414 F.3d 381, 395–97 (2d Cir. 2005).

In addition to the indicia of reliability identified in Rule 702, a trial court may consider

the criteria enumerated in *Daubert*, "some or all of which might prove helpful in determining the

reliability of a particular scientific theory or technique." *Clerveaux*, 984 F.3d at 233. The

*Daubert* factors are: (1) whether the methodology or theory has been or can be tested; (2)

whether the methodology or theory has been subjected to peer review and publication; (3) the

methodology's error rate and the existence and maintenance of standards controlling the

technique's operation; and (4) whether the methodology or technique has gained general

acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. "[W]hile a court

need not consider the *Daubert* factors, it does not abuse its discretion in doing so." *In re Mirena*

*IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 124 (2d Cir. 2020)

("*Mirena II*").

Although "Rule 702 sets forth specific criteria for the district court's consideration, the

*Daubert* inquiry is fluid and will necessarily vary from case to case." *Mirena II*, 982 F.3d at 123.

The *Daubert* factors do not constitute a "definitive checklist or test." *Daubert*, 509 U.S. at 593.

Proffered expert testimony can fail all four *Daubert* factors and still be admitted; however, in

those circumstances, a court must "carefully scrutinize, pause, and take a hard look at the

expert's methodology." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II),*

341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018) ("*Mirena I*"). So long as an expert's analysis is

reliable "at every step," it is admissible. *Mirena II*, 982 F.3d at 123. But "*any* step that renders

---

*Id*.; *see also In Re: Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, 22-md-3043, 2024 WL
3357608, at *13–14 (S.D.N.Y. July 10, 2024).

the analysis unreliable . . . *renders the expert's testimony inadmissible*." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (emphasis in original). Thus, it is not only *appropriate* for a district court "to take a hard look at . . . experts' reports"; rather, it is "*required* to do so to ensure reliability." *Mirena II*, 982 F.3d at 123 (emphasis added). "[I]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* Ultimately, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Although the Supreme Court in *Daubert* emphasized that the district court's inquiry under Rule 702 must focus "solely on principles and methodology, not on the conclusions that they generate," 509 U.S. at 595, it later clarified that "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, although:

> [t]rained experts commonly extrapolate from existing data[,] nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* Where, however, an expert "otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support [for an expert's opinion] may go to the weight, not the admissibility of the expert's testimony." *Mirena II*, 982 F.3d at 124. A "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's

12

opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## DISCUSSION

Defendants argue that I should entirely preclude Dr. Garlington from testifying at trial for three reasons: (1) she "relies on insufficient facts and data, rendering her methodology flawed and unreliable" under Rule 702(b)[8]; (2) she usurps the role of the jury in determining factual issues and assessing witness clarity and therefore would not "help the trier of fact to understand the evidence or to determine a fact in issue"; and (3) the probative value of the opinions set forth in her expert report is outweighed by the risk of unfair prejudice under Rule 403, Fed R. Ev. (Mot. at 6, 12, 13.) Williams opposes, arguing that Dr. Garlington's diagnosis and causation opinions are reliable because she reached them on the basis of numerous tests that are widely accepted amongst psychologists. (Opp'n at 10.) Williams also argues that any review of Williams' medical and counseling records would not alter Dr. Garlington's diagnosis or opinions as to what caused his PTSD, MDD, and other emotional and psychological injuries as set forth in Dr. Garlington's declaration submitted in opposition to the Motion to Preclude. (*Id.* at 8.)

For the following reasons, the Motion is granted in part. As a threshold matter, Williams has not provided sufficient information for the Court to assess Dr. Garlington's qualifications to opine on either the tests she administered or the psychological effects of racism and harassment

---

[8] Defendants only directly cite to sub-provision (b) of Rule 702, Fed. R. Evid. (Mot. at 7.) However, I understand Defendants to make arguments relating to Rules 702(c) and (d) as well. (*See* Mot. at 7–8.)

on the workplace, and the Court therefore reserves decision. With respect to her proffered opinions, Williams is precluded from offering testimony from Dr. Garlington at trial on any subjects other than her assessment that he exhibited symptoms of depression, anxiety, somatization, and cognitive distortions as reflected in the eight tests she administered to him in 2024 as disclosed in her expert report. As explained below, Dr. Garlington is precluded from testifying that she diagnosed Williams with PTSD and MDD and about the cause of any PTSD, MDD, depression, anxiety, somatization, and cognitive distortions experienced by Williams. Dr. Garlington is also precluded from repeating information reported by Williams during the examination and information that she reviewed in the transcripts of his deposition and the Complaint, including Williams' description of how he was treated by Defendants while working as Facilities Director at the District, with the following exception: pending this Court's determination that she is qualified to serve as an expert in clinical psychology, Dr. Garlington may provide limited testimony about Williams' responses to specific test questions to lay the foundation for her opinion that Williams exhibited symptoms of depression, anxiety, somatization, and cognitive distortions based on his test results. When testifying about such issues, Dr. Garlington must make clear that she lacks personal knowledge as to whether Williams' self-reported information is true.

## I.    Qualifications

Rule 702, Fed. R. Evid., provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may testify to an opinion on which specialized knowledge will assist the trier of fact. In some cases, "a district court may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too deficient." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d

76, 81 (2d Cir. 1997); *see also Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 329 (S.D.N.Y. 2022). However, even if a proposed expert lacks such specific training or experience, the expert "may still have 'practical experience' or 'specialized knowledge' qualifying [them] to give opinion testimony under Rule 702." *Lickteig*, 589 F. Supp. 3d at 328 (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)). In such cases, the court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent," as such lack of experience instead goes to the "weight, not the admissibility of the testimony." *Lane v. Am. Airlines, Inc.*, No. 18-cv-6110, 2024 WL 1200074, at *17 (E.D.N.Y. Mar. 20, 2024).

Here, Williams offers Dr. Garlington as an expert in clinical psychology who provides general opinions on the psychological effects of racial discrimination and harassment in the workplace as well as specific opinions pertaining to Williams based on a clinical evaluation and the administration of psychological tests. (Garlington Rpt. at 1, 8–9.) The parties do not dispute that Dr. Garlington is qualified to serve as an expert in clinical psychology, and they do not address whether she is qualified to opine about the psychological effects of racism and harassment in the workplace. (*See* Opp'n at 5 (noting that Defendants did not challenge Dr. Garlington's qualifications in their motion).) Nonetheless, because district courts are "charged with" the "gatekeeping" function of assessing expert testimony, I must determine whether Dr. Garlington is qualified by her knowledge, skill, experience, training, and/or education to offer at trial the opinions set forth in her expert report. *Mirena II*, 982 F.3d at 122–23.

15

Basic information about Dr. Garlington's education, experience, training, and qualifications are not in the record on Defendant's Motion to Preclude in part because no party included her curriculum vitae in their submissions. Dr. Garlington testified that she has more than 40 years of experience as a clinical psychologist, specializes in trauma, has done "anecdotal [work] with Anderson Cooper . . . looking at racism and bias," and wrote a dissertation and book on issues related to "racial identity." (*See* Garlington Dep. 12:3-16, 172:9–173:9.) Given the sparse record, I cannot determine whether Dr. Garlington is qualified as an expert in clinical psychology or whether she has "qualifications in a general field closely related to" the psychological impacts of racism. *Lane*, 2024 WL 1200074, at *17. As a result, I cannot determine at this time whether Dr. Garlington is qualified to serve as an expert in either clinical psychology or the psychological effects of racial discrimination and harassment in the workplace. I reserve decision on these questions for a later hearing or trial.

## II.    Reliability

Defendants argue that Dr. Garlington's opinions relating to her diagnosis of PTSD and MDD, the causes of these mental health conditions, and Williams' other emotional and psychological injuries are unreliable because they are "predicated entirely on cherrypicked documents, Plaintiff's legal allegations, and self-reporting about his treatment at work." (Mot. at 6.) Specifically, Defendants emphasize that Dr. Garlington did not review any records from Williams' other medical or counseling providers in diagnosing him with PTSD and MDD, and that she therefore was unaware that he had been diagnosed with dementia in 2022. (Mot. at 8.) Williams admits that Dr. Garlington did not review any of his medical or counseling records before reaching her opinions, but argues that her diagnosis is nonetheless reliable because she "conducted multiple assessments" of him, which have "each gained wide accepta[nce] in the

16

psychological community," and that any review of Williams' medical records would not have

"any bearing on her opinion." (Opp'n at 8.)

Courts regularly admit diagnoses of PTSD and MDD by psychologists where they

conducted an in-person clinical interview and reviewed the plaintiff's medical records and other

documents prepared in the course of litigation. *See, e.g.*, *Tardif v. City of New York*, 344 F. Supp.

3d 579, 600 (S.D.N.Y. 2018) (finding that diagnosing a person based on such information "is

generally a reliable way to reach an expert opinion related to a psychological condition"

(collecting cases)); *Lane*, 2024 WL 1200074, at *12 (describing review of medical records and a

lengthy examination as a "conventional method[] for rendering psychiatric diagnosis");

*Schoolcraft v. City of New York*, No. 10-cv-6005, 2015 WL 6444620, at *2 (S.D.N.Y. Oct. 23,

2015) (describing a 90 minute interview of the plaintiff, review of deposition transcripts, and

review of medical and psychological records as a "tried and true method of diagnosis" because it

is based on "multiple facts and data points from a variety of sources"). By contrast, although

"failure to review medical records" does not necessarily "render[] an expert psychologist's

opinion *per se* unreliable," there are "very few cases in the Second Circuit in which the court has

been presented with an expert medical opinion where the expert, either *when diagnosing* the

patient *or determining causation*, did *not* consult the patient's medical records." *El Ansari v.*

*Graham*, No. 17-cv-3963, 2019 WL 3526714, at *5 (S.D.N.Y. Aug. 2, 2019) (emphasis added).

"[I]n these very few cases, courts have *invariably found* such opinions to be unreliable." *Id.*

(emphasis added).[9]

---

[9] *See, e.g.*, *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 602 (S.D.N.Y. 2016)
(finding an expert's diagnosis of bipolar disorder unreliable where the expert did not conduct an
in-person examination of the plaintiff or review her medical records); *Hewlett-Packard Co.*, No.

Moreover, to the extent that an expert's opinion touches upon the cause of a party's condition, "it will satisfy *Daubert's* prerequisites for reliability only if the doctor conducted a meaningful '*differential diagnosis*' ruling out other possible contributing factors." *Matthews v. Hewlett-Packard Co.*, No. 15-cv-3922, 2017 WL 6804075, at *2 (S.D.N.Y. Dec. 22, 2017) (concluding that an expert unreliably opined about a life event that caused a plaintiff's MDD); *Barth v. United States*, No. 2:22-cv-1155, 2025 WL 2753721, at *9 (E.D.N.Y. Sept. 29, 2025) (same), *appeal withdrawn*, No. 25-2510, 2025 WL 4041908 (2d Cir. Dec. 15, 2025). "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Hewlett-Packard Co.*, 2017 WL 6804075, at *2; *see also* Fed. R. Evid. 702 advisory committee's notes to the 2000 amendments (stating that, in assessing the reliability of an expert's proffered opinion, courts should determine whether the expert "has adequately accounted for obvious alternative explanations").

Here, Dr. Garlington seeks to offer three overarching opinions at trial that fail to satisfy Rule 702 standards: her diagnosis that Williams suffers from PTSD, her diagnosis that Williams suffers from MDD, and her opinion that his reported experience of discriminatory treatment and harassment at the District caused Williams to suffer from PTSD, MDD, and symptoms of

---

15-cv-3922, 2017 WL 6804075, at *2 (S.D.N.Y. Dec. 22, 2017) (finding unreliable expert opinion that a plaintiff's workplace caused his MDD where the expert "did not review . . . Plaintiff's medical records"); *cf. United States v. Smith*, 806 F. Supp. 3d 382, 399 & n.6 (S.D.N.Y. 2025) (finding that an expert's diagnosis of Autism Spectrum Disorder was reliable because it relied on "multiple sources of information, including clinician's observations" from the defendant and "caregiver history" from interviews with family; the court acknowledged that "[u]nlike in some . . . cases," the expert did not review medical records but it was "unclear what records would be relevant").

depression, anxiety, somatization, and cognitive distortions. There is "too great an analytical gap" between the facts and data and any of these three opinions because Dr. Garlington failed to review Williams' medical records, to rule out alternative causes of the symptoms she observed, and to conduct a differential diagnosis. *Joiner*, 522 U.S. at 146. Moreover, the fact that her report reaches opinions on causation and a psychological diagnosis without going through such steps demonstrates a belief that ruling out alternative causes is unnecessary to reach such opinions. Accordingly, Dr. Garlington's diagnosis of Williams with PTSD and MDD and her causation opinions are precluded under Rule 702(c) as based on unreliable principles and methods and under Rule 702(d) because her expert report and deposition testimony fail to provide sufficient information to show that these opinions are the result of reliable principles or methods. Dr. Garlington's causation opinions suffer from the additional problem that they are based on insufficient facts or data under Rule 702(b). By contrast, Dr. Garlington's opinions that Williams exhibited symptoms of depression, anxiety, somatization, and cognitive distortions at the time of her 2024 examination are based on sufficient data and the application of reliable methods because she reached these findings after administering eight widely accepted tests to Williams and making findings based on the test results.

A.   Diagnosis of PTSD and MDD is Unreliable Under Rules 702(c) and (d).

Dr. Garlington's expert report and deposition testimony fail to provide sufficient information to show that her opinions that Williams suffers from PTSD and MDD are the result of a reliable application of principles or methods as required by Rule 702(d). At a more basic level, her diagnosis that Williams suffers from PTSD and MDD is based on unreliable principles and methods and thereby fails to meet the requirements of Rule 702(c) for two overarching reasons that compound one another as explained below.

First, Dr. Garlington never reviewed any of Williams' medical or counseling records or made any effort to contact his medical or counseling providers, rendering her analytical methodology for reaching the PTSD and MDD diagnosis unreliable. Although there is no "definitive checklist or test" for assessing the reliability of an expert, *Daubert*, 509 U.S. at 594, the failure to review medical or counseling records or to otherwise secure information about his medical or counseling history is significant because it is undisputed that Williams suffers from dementia, that Dr. Garlington was not aware of this dementia diagnosis when she reached the opinions set forth in her report, and that she relied entirely on Williams' self-reports and the transcript of Williams' deposition, where he denied having ever been diagnosed with a memory impairment, rather than seeking to corroborate his reported information from any other sources. (*See* Williams Dep. 322:17–323:2 ("Q. Have you ever been diagnosed with any kind of physical condition that impairs your memory? A. No. Q. Are you aware of any physical condition that would impair your memory? A. No."); Garlington Dep. 129:9–13 (testifying in deposition that she was unaware that Williams had been evaluated by a neuropsychologist).) Dr. Garlington acknowledged that Williams reported that he had attended several virtual therapy sessions with a psychologist after the termination of his role with the District, and she recognized in "hindsight, it would have been good to get [the doctor's notes]." (Garlington Dep. 157:19–23.) Yet, when asked why she did not request these records, Dr. Garlington "[could not] answer why not, [she] just didn't" as she "usually go[es] with what is given to [her] by the attorney" contracting her services. (*Id.* 60:12–61:8.)

The fact that Dr. Garlington felt comfortable reaching a psychological diagnosis without requesting prior medical or counseling records is not a sound methodology under *Daubert*. *See El Ansari*, 2019 WL 3526714, at *5 (finding that a psychologist's determination that it was

20

"'unnecessary' to corroborate what the Plaintiff was telling him because he 'felt that he had information to draw his conclusion in this case'" was not sufficient because "the expert feeling comfortable, without more, is not a sound methodology under *Daubert*"); *Tardif*, 344 F. Supp. 3d at 600 (finding that review of prior medical records from two specified time periods, along with three clinical interviews, an observation, and review of deposition testimony was "generally a reliable way to reach an expert opinion related to a psychological condition" and citing supporting caselaw). The Court recognizes that "[t]here may well be scenarios in which a psychologist can reliably diagnose a patient without the aid of medical records" or similar information from other sources. *El Ansari*, 2019 WL 3526714, at *4. However, here, because of the fact that Williams suffered from dementia at the time of Dr. Garlington's 2024 examination—a condition that may impact his ability to recall information—Dr. Garlington's failure to review or seek out his medical records or comparable information prior to reaching a diagnosis based in significant part on his self-reported information contributes to an unreliable methodology. Williams fails to show how this case is distinguishable from *El Ansari*, where the court precluded a psychologist from testifying about his diagnosis that a plaintiff suffered from MDD—one part of the diagnosis here—because the expert failed to review or procure the plaintiff's medical records but had conducted a clinical examination and administered seven psychological tests. 2019 WL 3526714, at *1, *4–5. Nor has Williams identified a single case in which a court permitted an expert psychologist to offer an opinion regarding a psychological

21

diagnosis without having reviewed the patient's prior medical or counseling records. (Opp'n at 6–10.)[10]

Second, Dr. Garlington provided almost "no analysis to show how the [relevant] guidelines were actually applied to reach [her] diagnosis" that Williams suffers from PTSD and MDD. *El Ansari*, 2019 WL 3526714, at *6. Although her report sets out the ICD-11 diagnostic criteria for PTSD, it does not provide *any* diagnostic criteria for MDD or otherwise explain what criteria Dr. Garlington applied to observed facts or test results to diagnose Williams with MDD. *See* Garlington Rtp. at 10; *see El Ansari*, 2019 WL 3526714, at *6 (laying out specific criteria for diagnosing MDD under the Diagnostic and Statical Manual of Mental Disorders, Fifth Edition ("DSM-V")). This is particularly troubling because it is not clear that Dr. Garlington followed an "express requirement" of the DSM-V, which she testified is one of the two accepted psychological guidelines for diagnosing MDD. *Id.* at *5. As the court recognized in *El Ansari*, the DSM-V "explicitly require[s]" a determination that an examinee's symptoms "are not attributable to the psychological effects of . . . another medical condition" before a person may be diagnosed with MDD. *Id.*[11] As explained *infra*, prior to reaching the opinions set forth in her

---

[10] The Court is aware of at least one case in which a psychologist's diagnosis was found to be reliable without review of medical records, where the psychologist's approach conformed to the American Psychiatric Association's DSM-V guidelines, because it relied on "multiple sources of information, including clinician's observations, caregiver history, and . . . self-report." *United States v. Smith*, 806 F. Supp. 3d 382, 399 (S.D.N.Y. 2025). The court found that the expert met these standards because she not only interviewed the plaintiff directly, but also interviewed the plaintiff's family for a "caregiver history" and reviewed records created by another clinical psychologist. *Id.* at 399–400 & n.6. Moreover, the court noted, it was "unclear what [medical] records would be relevant" to the psychologist's diagnosis. *Id.* at 400 n.6. Here, none of these same facts exist.

[11] Although Dr. Garlington used the ICD-11criteria instead of the DSM-V criteria to diagnose Williams, she testified that both are "diagnostic manual[s] that *every provider* uses to diagnose,"

report, Dr. Garlington did not consider whether any of Williams' symptoms contributing to the diagnosis of MDD were attributable to dementia.

Dr. Garlington's diagnosis of Williams with PTSD suffers from similar problems. Although Dr. Garlington "recite[s] the [ICD-11] requirements" for PTSD, *El* Ansari, 2019 WL 3526714, at *6, she does not explain *how* she applied those criteria to the facts she observed or Williams' test results. (Garlington Rpt. at 10–11).[12] For example, the ICD-11 provides that a PTSD diagnosis requires finding that the patient either has an "[i]nability to recall, either partially or completely, some . . . period of exposure to the stressor" (Criterion D1) or "[p]ersistent symptoms of increased psychological sensitivity and arousal (not present before exposure to the stressor)" as shown by any two of four symptoms, two of which are "[d]ifficulty in concentrating" and "[i]rritability or outburst of anger" (Criterion D2). (Garlington Rpt. at 1– 12.) Dr. Garlington does not explain in her report which of the ICD-11 criteria she found

---

and when asked about the difference between the two, she testified that there was a "lot of overlap, just different organizations deciding to create theirs." (Garlington Dep. 194:14–17, 195:6–10.) Dr. Garlington continues to "go to the DSM if [she] want[s] to look up something" but uses the ICD because that is "what most insurance companies request." (*Id.* 196:3–9.) As a result, failure to adhere to the criteria within the DSM-V is not a *per se* basis for finding Dr. Garlington's diagnosis unreliable, but the DSM-V is instructive in assessing the reliability of her opinions. Accordingly, although not dispositive in this case, Dr. Garlington does not explain whether she determined that the symptoms experienced by Williams, which she attributes to PTSD, are *not* caused by another illness as required by the DSM-V criteria for PTSD. *See, e.g.*, *Jennifer W. v. Comm'r of Soc. Sec.*, No. 5:19-cv-37, 2020 WL 549357, at *18 (D. Vt. Feb. 4, 2020) (describing the DSM-V criteria for diagnosing PTSD which, like the criteria for MDD, require a finding that "[s]ymptoms are not due to . . . other illness").

[12] In her deposition testimony Dr. Garlington was asked and provided some limited detail regarding how she analyzed the various ICD-11 criteria, but as noted already, much of that testimony was conclusory or lacked factual articulation. (Garlington Dep. 201:17–202:19; *supra* note 5.) Regardless, "it is well-settled that an expert's deposition testimony cannot cure a party's failure to include opinions in their expert's report under Rule 26" or to explain any reasoning that is missing from the report. *Rodriguez v. Vill. of Port Chester*, 535 F. Supp. 3d 202, 211 (S.D.N.Y. 2021).

23

Williams to satisfy; nor does she explain how each of the eight individual test results "fit into the [ICD-11] guidelines." *El Ansari*, 2019 WL 3526714, at \*6.

These two deficiencies—Dr. Garlington's failure to review or otherwise seek out Williams' medical information and her failure to explain how she applied the diagnostic criteria for MDD and PTSD to the facts and data before her—compound each other. Because she failed to procure information about Williams' medical condition, she did not learn of his dementia and could not have accounted for whether she would diagnose him with MDD or PTSD notwithstanding his dementia and any symptoms stemming from it. Additionally, her failure to explain how the diagnostic criteria for MDD and PTSD apply to any information she observed or Williams' test results contributes to her failure to show in her report that she appropriately ruled out potential alternative causes of the facts and data supporting the MDD and PTSD diagnosis, including but not limited to dementia.

Indeed, in her report, Dr. Garlington sets forth her observation that Williams exhibited "selective memory in an attempt not to relive trauma," has "difficulty concentrating and focusing," "gets irritable with [his wife]," and "has not returned to the high level of functioning that he exhibited" while working for the District in the position from which he was terminated. (Garlington Rpt. at 3–5.) According to Dr. Garlington, Williams also reported that he is "more forgetful now . . . and [he] get[s] confused." (*Id.* at 4.) Dr. Garlington fails to explain which, if any, of these specific observations contribute to her finding that each of the ICD-11 criteria for PTSD are satisfied, including Criterion D1 (inability to recall) or Criterion D2 (persistent symptoms in two of four categories, including difficulty concentrating and irritability/outbursts of anger), and whether she considered alternative explanations, such as dementia. (*See* Garlington Dep. 203:2–9 (acknowledging that some patients with dementia experience instability

24

or outburst of anger and difficulty concentrating).) Moreover, these deficiencies are underscored by a 2022 report by Williams' treating neuropsychologist, where Dr. Weber attributes Williams' irritability to his memory issues related to dementia, describes his executive functions as "extremely low to average," finds that Williams experiences difficulty with recall, and notes that Williams did not "report any significant depression, anxiety, and/or hopelessness." (Weber Rpt. at 2–3, 5.)

Additionally, for a PTSD diagnosis, the ICD-11 requires that the D1 or D2 criteria "be met within 6 months of the stressful event or at the end of a period of stress." (Garlington Rpt. at 11.) From Dr. Monroe's testimony, there are June and August 2021, July and August 2022, and March 2023 notes of his psychological treatment of Williams. (Monroe Dep. 68:5–11, 77:4–13, 107:3–9, 114:4–7.) Additionally, Dr. Weber's report indicates that Williams reported minimal depression and anxiety and no difficulties sleeping in August 2022. (Weber Rpt. at 3.) All of these records could be relevant to Dr. Garlington's evaluation of Williams for PTSD and are closer in time to the District's termination of Williams from the Facilities Director role than Dr. Garlington's 2024 evaluation. (*See* Garlington Rpt. at 10–11; Weber Rpt. at 2; *see also* Garlington Rpt. at 6, 11 (reflecting that Williams had a "history of [s]leep disturbances" and difficulty sleeping is part of PTSD Criterion D2).) Nonetheless, she did not review or request such records prior to reaching her opinion that Williams suffers from PTSD and MDD. Accordingly, Dr. Garlington's failure to conduct an analysis supporting the conclusion that symptoms attributed to PTSD and/or MDD were not caused by "other medical conditions," including dementia, renders her PTSD and MDD diagnosis unreliable. *See El Ansari*, 2019 WL 3526714, at *4–6 (concluding that an expert diagnosis was unreliable for failure to rule out that

25

symptoms attributed to MDD may have instead been caused by "other medical conditions," including postpartum depression).

Williams' arguments to the contrary are not persuasive. First, it does not matter that Campo "corroborated what Mr. Williams expressed about race based discrimination" (Opp'n at 8) because the unreliability in Dr. Garlington's opinion stems not from her failure to corroborate Williams' self-report that he suffered discrimination and harassment (which goes to Criterion A of PTSD—the finding that the patient was "exposed to a stressful event or situation . . . of exceptionally threatening or catastrophic nature"), but from her failure to reliably apply the other diagnostic criteria to the facts and data before her. As noted, Dr. Garlington's report fails to explain how she applied PTSD Criterion B (the patient's experience of persistent remembering/reliving the stressor or experiencing distress in response to triggers), Criterion C (avoidance of circumstances similar to or associated with the stressor), or either of the two prongs of Criterion D (inability to recall or persistent symptoms of increased psychological sensitivity shown by two of four categories), or whether any facts indicative of these three criteria emerged within six months of the alleged discrimination and harassment. Moreover, as explained above, Dr. Garlington entirely failed to identify *any* diagnostic criteria for MDD— whether from the ICD-11, the DSM-V, or any other source—or to explain how she applied any such criteria to the facts and data before her to conclude that Williams suffers from MDD.

Second, the fact that Dr. Garlington relied on "generally accepted testing, as well as [Williams'] body language" (Opp'n at 8–10), likewise does not cure the reliability issues addressed above, because it does not demonstrate that she considered, but ruled out, dementia as the cause of any symptoms attributed to PTSD and MDD. To be clear, Defendants have not argued that Dr. Garlington applied the *specific tests* she administered in an unreliable fashion or

26

that she lacked a reliable methodology by which to conclude, based on these tests, that Williams showed signs of depression, anxiety, somatization, and cognitive distortions. (Opp'n at 10–11.) Although her report does not clearly explain how she administered the tests (*see* Garlington Rpt. at 6–7), Dr. Garlington testified that she administered at least two of the tests on paper but that she "like[s] to vary [the tests] to get more depth than just somebody checking off things" so she conducted many of the tests as a "discussion." (Garlington Dep. 162:4–17.) She does not explain what this means or how significantly she varied from the standard tests or whether doing so is an established and accepted practice in the field of clinical psychology. She also could not recall whether she recorded Williams' responses to any tests administered on paper or whether she retained any notes from her examination. (*Id.* 162:24–163:20.) Although Defendants requested such documents on the record during the deposition (*id.* 163:7–10), the Motion to Preclude does not indicate whether Defendants received any such documents during expert discovery.

The eight tests that Dr. Garlington administered are generally accepted in the field of clinical psychology and are therefore reliable. *See Lane*, 2024 WL 1200074, at *8 (recognizing the reliability of standard psychological tests, including the Beck Depression Inventory test); *see also Daubert*, 509 U.S. at 593–94 (recognizing that a trial court may consider whether the methodology has garnered general acceptance in the relevant scientific community). Defendants have not argued or shown that Dr. Garlington's "var[iance]" from the tests (Garlington Dep. 162:7) raises a question as to whether such practice "reflects a reliable application of the principles and methods to the facts of the case." Rule 702(d), Fed. R. Evid. As a result, the "analytical gap" between the record and Dr. Garlington's opinion that Williams shows symptoms of depression, anxiety, somatization, and cognitive distortions based on the tests is not so great as to violate Rule 702(d). *Joiner*, 522 U.S. at 146; *Mirena II*, 982 F.3d at 124 (holding that where

27

an expert "otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support [for an expert's opinion] may go to the weight, not the admissibility of the expert's testimony"). To the extent Dr. Garlington erred by deviating from accepted practice, Defendants have not argued or shown that any such deviation was anything more than the type of "minor flaw in an expert's reasoning or . . . slight modification of an otherwise reliable method" that "will not render an expert's opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267. Accordingly, any potential deficiencies in how Dr. Garlington administered the eight tests or how she interpreted the results of the tests, which are otherwise reliable methods for testing for psychological conditions, including depression and anxiety, is a question going to the weight of her proffered testimony, which may be assessed through cross-examination.

Therefore, pending this Court's determination that Dr. Garlington is qualified to serve as an expert in clinical psychology, Dr. Garlington may testify that the tests she administered to Williams showed that he exhibited symptoms of depression, anxiety, somatization, and cognitive distortions, and Defendants may argue that these symptoms are attributable to causes other than Defendants' challenged conduct, such as dementia, the impact of that condition on Williams' life, and his lack of adequate performance as Facilities Director. However, Dr. Garlington is precluded from opining that the symptoms she found Williams to exhibit meet the criteria for MDD or PTSD because there is a significant "analytical gap" between her diagnosis and the available data, *Joiner*, 522 U.S. at 146, and because she failed to conduct *any* inquiry (including but not limited to review of Williams' medical and counseling records) to rule out the possibility that his symptoms stemmed from other causes and provided no analysis as to how she applied diagnostic criteria to the facts and data before her, *El Ansari*, 2019 WL 3526714, at *4–6.

28

Third, Williams argues that dementia and PTSD are not "alternate or differential" diagnoses because they "each present differently." (Opp'n at 9.) In support, Williams relies on Dr. Garlington's testimony that although dementia can cause difficulty concentrating, "[t]he presentation is different in trauma" because "[s]ometimes there's . . . body movements that a person who's agitated with dementia is very different than a person who's agitated because of trauma." (Garlington Dep. 203:8–13, 204:18–205:9.) However, this testimony does not correct the unreliable methodology Dr. Garlington used to reach her PTSD and MDD diagnosis for two reasons. First, Dr. Garlington did not demonstrate in her expert report that she considered any distinctions in the way that PTSD, MDD, or dementia manifest when she reached her opinions that Williams suffers from PTSD and MDD. Thus, her "deposition testimony cannot cure" the failure to include opinions in her report regarding how to diagnose PTSD and MDD as opposed to dementia. *Rodriguez v. Vill. of Port Chester*, 535 F. Supp. 3d 202, 211 (S.D.N.Y. 2021). Second, even at the time she was deposed, Dr. Garlington had not reviewed Williams' medical records and did not know of his dementia diagnosis. She admitted that although she would not "necessarily" reevaluate any opinions in her report had she known that Williams had been diagnosed with dementia after evaluation by a neurologist and a neuropsychologist, she would want to know when and how they diagnosed him and would consider "what were the symptoms . . . . which ones overlap with what I identify and what is distinct, and if what is distinct is still trauma, then the trauma is still trauma." (Garlington Dep. 210:12–212:6.) Because Dr. Garlington had not performed such an analysis *prior* to her deposition, much less prior to reaching the opinions set forth in her expert report, she cannot reliably opine on these issues at trial.

29

Finally, Williams also relies on a declaration submitted by Dr. Garlington *after* she was deposed and discovery closed, in which she attests that she was provided and reviewed the records of Williams' treating neurologist and neuropsychologist and that her "initial psychological assessment and diagnoses" set forth in her expert report "[have] not changed." (Garlington Decl. ¶¶ 6–10, ECF No. 15.) However, this belated declaration does not address the deficiencies in any of the unreliable opinions set forth in Dr. Garlington's expert report. "[C]ourts will not admit supplemental expert evidence following the close of discovery when it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011). For this reason, on January 16, 2025, Magistrate Judge Wicks granted Defendants' motion to strike a supplemental expert report from Dr. Garlington that included similar opinions as those set forth in her declaration. (*See* ECF No. 67.) After Judge Wicks struck her supplemental report, Dr. Garlington executed her declaration on March 7, 2025, and Williams submitted it in opposition to the Motion to Preclude Dr. Garlington's testimony. (*See* Garlington Decl.) Williams cannot circumvent the ruling on Defendants' motion to strike by submitting an expert declaration prepared after the close of discovery, which sets forth numerous opinions that fill analytic gaps in Dr. Garlington's original expert report—specifically, her views regarding the distinctions between PTSD and dementia symptoms and her belated opinions based on a review of records relating to Williams' treatment by Dr. Glasman and Dr. Weber.[13]

---

[13] Both the supplemental report and the declaration offer opinions concerning Williams' dementia diagnosis that are not set forth in Dr. Garlington's expert report, even though each document differs as to the specific opinions set forth (*See* Garlington Decl. ¶¶ 6–10.) For

Accordingly, Dr. Garlington's opinions diagnosing Williams with PTSD and MDD are precluded under Rule 702(c) as based on unreliable principles and methods and under Rule 702(d) because Dr. Garlington's expert report and deposition testimony fail to provide sufficient information to show that these opinions are the result of reliable principles or methods. By contrast, Dr. Garlington's opinions that Williams showed symptoms of depression, anxiety, somatization, and cognitive distortions based on the administration of eight psychological tests as described in her expert report are reliable as long as Dr. Garlington does not opine that these symptoms were caused by or are consistent with trauma, PTSD, or MDD.

B.   Causation Opinions

Throughout her report, Dr. Garlington opines that Williams' experiences while working as Facilities Director caused him to suffer from PTSD, depression, anxiety, somatization, and cognitive distortions. For example, she opines that as a "*direct result* of his interactions experienced at East Meadow School District, especially by Mr. Pizzo, and the discrimination and hostile work environment that he was subjected to on a regular basis, Arthur Williams developed Post-Traumatic Stress Disorder with co-occurring depression and anxiety." (Garlington Rpt. at 11 (emphasis added).) She further opines:

---

example, in her supplemental report, Dr. Garlington revised her initial diagnosis to conclude that, given his dementia diagnosis, Williams has Complex PTSD ("CPTSD"). (ECF No. 61-4 at 5.)

To the extent Williams submitted the declaration in an attempt to circumvent Judge Wicks' ruling striking Dr. Garlington's supplemental expert report, this Court is mindful that "[t]he law of the case doctrine . . . counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008); *see also Reynolds v. HNS Mgmt. Co.*, No. 23-484-cv, 2025 WL 783733, at *2 (2d Cir. Mar. 12, 2025). Here, there is no reason to revisit Judge Wicks' ruling.

31

> Review of prior history is unremarkable. There is no evidence of prior intellectual, emotional, social, or vocational history which would account for Mr. Williams' symptoms. The symptoms described by Mr. Williams, as well as the results of this evaluation, are the consequential result of the harassment and discrimination experienced at work.

(*Id.* at 11.) These causation opinions fail to meet the standards of *Daubert* and Rule 702. They are based on inadequate facts and data under Rule 702(b) as well as a methodology that is unreliable under Rule 702(c) in that it fails to address and rule out potential alternative causes of Williams' psychological and emotional symptoms, including dementia and the impacts of dementia on his life. Moreover, Dr. Garlington's report and deposition testimony fail to show that these opinions reflect the reliable application of principles and methods to the facts and data before her as required by Rule 702(d).

"When a medical expert gives an opinion on causation, rather than merely a diagnosis, the expert typically performs additional analyses or tests, such as a 'differential diagnosis' test, to isolate other potential causes of the illness." *El Ansari*, 2019 WL 3526714, at *6. "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing *specific alternate factors* identified by the defendant." *Id*. (emphasis added). Numerous courts have concluded that an expert's proffered opinion about the cause of a psychological injury is unreliable where the expert failed to conduct a differential diagnosis to rule out alternative causes. *See, e.g.*, *Tardif*, 355 F. Supp. 3d at 601–02; *Lane*, 2024 WL 1200074, at *8; *Matthews*, 2017 WL 6804075, at *3.

Here, based on the administration of certain tests to Williams, Dr. Garlington opined that Williams reported feelings that include, but are not limited to, "agitation, loss of interest in usual activities, indecisiveness, feelings of worthlessness, and a marked loss of energy" and "guilt that

32

he 'failed [his] family.'" (Garlington Rpt. at 6–7.) However, Dr. Garlington's report does not demonstrate that she applied reliable principles and methods in concluding that Defendants' alleged conduct toward Williams caused these emotional and psychological harms. In her report and deposition testimony, Dr. Garlington failed even to address *any* potential alternative causes of Williams' apparent PTSD, MDD, and symptoms of depression, anxiety, somatization, and cognitive distortions, much less provide analysis ruling out any potential alternative causes. Moreover, because she did not know of his dementia, Dr. Garlington did not consider whether dementia caused these conditions and symptoms.

To be clear, Defendants have not shown whether dementia can cause PTSD, and dementia may or may not be a "stressful event or situation . . . of *exceptionally threatening or catastrophic nature*" that causes "persistent remembering or 'reliving' of the stressor in intrusive 'flashbacks,' vivid memories, or recurring dreams." (Garlington Rpt. at 10 (discussing Criteria A and B of the ICD-11 criteria for PTSD).) However, Dr. Garlington still failed to consider whether there was *any other cause* of the symptoms on which she relied to diagnose Williams with PTSD. Even if she had considered alternative causes, Dr. Garlington's PTSD diagnosis is precluded as unreliable for the additional reasons explained above. *See supra* Discussion.II.A.

Although there are exceptions to the need for a differential diagnosis, those exceptions do not apply here. Dr. Garlington is not a treating physician, who may not need to perform a differential analysis in order to reach a causation conclusion. *El Ansari*, 2019 WL 3526714, at *7. Moreover, this is not a case where a differential diagnosis is not necessary because the connection between the injury and its source is obvious to a layperson—"such as with a car accident and a broken leg." *Tardif*, 344 F. Supp. 3d at 602.

Finally, Dr. Garlington's causation opinion lacks the indicia of reliability that might save the opinion from her failure to conduct a differential diagnosis for numerous reasons, including that Dr. Garlington failed to review any of Williams' medical or counseling records or to otherwise seek his medical information to corroborate Williams' representations and to explore potential alternative causes of his symptoms. *See supra* Discussion.II.A. Moreover, Dr. Garlington examined Williams in 2024—more than five years *after* the District's January 2019 decision to terminate him from the role of Facilities Director. In the meantime, in around 2022, Williams was diagnosed with dementia, which has impacted his cognitive abilities and potentially his behavior and relationships. (Weber Rpt. at 2–3, 5 (concluding that Williams' "executive functioning varied from being extremely low to average," that his memory "varied from being extremely low to average," and that he "reported primary deficits in memory being forgetful" but "did not report any significant depression, anxiety, and/or hopelessness on self-report measures"); *see also id.* at 1 (documenting that in August 2022, Williams' wife reported that he exhibited "changes in his personality being more irritable," which she attributed to his memory issues).) Thus, this case is distinguishable from those in which a differential diagnosis is not necessary where, among other things, a strong temporal connection exists between the challenged incident and the injury. *See, e.g.*, *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003).

### III. Helpfulness

Next, Defendants argue that Dr. Garlington's opinions must be precluded because they "encroach[] upon the roles of the judge and jury" and therefore will not "help the trier of fact." (Mot. at 11–12.) Specifically, Defendants challenge information throughout Dr. Garlington's report relating to the factual issues in this case, including her repetition of Williams' self-

reporting regarding alleged discrimination and hostile work environment, and claims regarding Williams' "exceptional work and performance history." (Mot. at 12–13) Williams responds that because Dr. Garlington's report is "not going to come into evidence," she should be permitted to offer testimony on these subjects as long as she does not use "legally operative" terms such as "discrimination," "harassment," and "hostile." (Opp'n at 12.) Willams maintains that as long as Dr. Garlington does not assert any legal conclusions such testimony does not encroach on the role of the jury. (*Id.*)

Dr. Garlington's report features significant factual narrative of which she lacks any personal knowledge and that is unnecessary to provide an explanation of what psychological tests she administered to Williams and the results of those tests. *See Tardif*, 344 F. Supp. 3d at 603 (precluding an expert from providing such testimony because "factual narrative from an expert is unnecessary, and [the expert] has no personal knowledge of the underlying facts"); *Matthews*, 2017 WL 6804075, at *4 (precluding the testimony of a psychologist who prepared a report, the "majority" of which, consisted of the "simple recitation" of facts the plaintiff shared during the psychologist's examination of him); *In re Rezulin Prod. Liab. Litig.*, 309 F.Supp. 2d 531, 551 (S.D.N.Y. 2004) (precluding expert testimony that consisted of a "narrative of the case which a juror is equally capable of constructing"). Permitting Dr. Garlington to repeat what Williams told her during her clinical examination as fact, as is done throughout her expert report, creates a significant risk that the jury will improperly conclude that Dr. Garlington is bolstering Williams' testimony or otherwise testifying about the legal conclusions in this action, even if she avoids using legal terms such as "discrimination," "hostile," and "harassment." *See United States v. Scop*, 846 F.2d 135, 139–43, *modified*, 856 F.2d 5 (2d Cir. 1988) (finding reversible error in permitting an SEC investigator with no personal knowledge of the facts to characterize

defendant's conduct as "fraudulent" in language that tracked the governing statute). The same is true of testimony from Dr. Garlington that Williams "appeared reliable as a personal historian," as such testimony intrudes into the jury's role of assessing Williams' credibility. (Garlington Rpt. at 3.) Accordingly, Dr. Garlington is precluded from testifying about many of the facts set forth in her report on page 2, the first two paragraphs of page 3, page 4, page 8, page 9, and the top of page 10.

By contrast, pending this Court's determination that Dr. Garlington is qualified to serve as an expert in clinical psychology, some very limited testimony about the information that Williams provided to Dr. Garlington during administration of the tests, as shown on pages 6 and 7 of her report, *may* be admissible to establish a foundation for how she administered the tests. However, Dr. Garlington will be permitted to describe Williams' responses to specific test questions only to the extent necessary to provide a foundation for her findings that the test results showed that Williams experienced symptoms of depression, anxiety, somatization, and cognitive distortions. In doing so, she must clearly identify information that lies outside her personal knowledge, such as any description of Defendants' alleged conduct and Williams' feelings and behavior at any time prior to her examination. For example, testimony from Dr. Garlington that Williams' responses to questions showed that he felt "unfulfilled, lack[ed] enthusiasm and [felt] that his life didn't have the same meaning" at the time of the examination as compared to the time when he worked as Facilities Director is permissible as it would make clear that her opinions are based on Williams' self-reported feelings at the time of the exam—not earlier in time. (Garlington Rpt. at 7.)

By contrast, Dr. Garlington is precluded from testifying about her opinion that Williams experienced heightened anxiety when "thinking about or relieving the incidents of harassment,

discrimination and verbal abuse" because such an opinion improperly presents legal conclusions and goes beyond what is necessary to establish the foundation for her findings based on Williams' test results. (Garlington Rpt. at 6.) To aid in distinguishing precluded and potentially admissible testimony, attached to this opinion is an annotated copy of Dr. Garlington's report striking information in the report that she is precluded from testifying about.

## IV. Prejudice

Finally, Defendants argue that Dr. Garlington's testimony should be precluded as unduly prejudicial and because it risks confusing the issues under Federal Rule of Evidence Rule 403. (Mot. at 13.) Under Rule 403, expert testimony "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely*, 414 F.3d at 397. Here, I need not determine whether Dr. Garlington's testimony as to her PTSD and MDD diagnosis and causation opinions should be excluded under Rule 403, because I have already determined that these opinions fail to meet the requirements of Rule 702. However, testimony from Dr. Garlington that repeats Williams' self-reported testimony regarding his work performance and the circumstances of the alleged discrimination and hostile work environment carries a significant risk of confusing the issues and misleading the jury for the same reasons that such testimony is not helpful for the jury. Such testimony from Dr. Garlington also has limited probative value because Williams can testify himself to these facts. Accordingly, Dr. Garlington is precluded from repeating what Wiliams self-reported to her about his work performances and the circumstances of the alleged discrimination and hostile work environment under Rule 403, with the limited exception set forth above in Discussion Section III.

Likewise, Dr. Garlington is precluded under Rule 403 from testifying about Williams' self-reported emotions, feelings, and injuries experienced while employed with East Meadow or in the months and years following the termination. Dr. Garlington lacks personal knowledge regarding these facts and Williams can testify to his emotional state and any alleged injuries suffered, so there is little to no probative value to hearing testimony from Dr. Garlington on these subjects. As a result, the risk that such testimony could cause unfair prejudice by lending an expert's imprimatur to such self-reported testimony, substantially outweighs its limited probative value.

All that remains is the admissibility under Rule 403 of Dr. Garlington's proffered opinions that the tests administered to Williams showed that he exhibited symptoms of depression, anxiety, somatization, and cognitive distortions at the time of her examination. Contrary to Defendants contentions (Mot. at 14), testimony of this kind is purely within the limits of Dr. Garlington's personal knowledge and would not shed light on whether Williams suffered unlawful discrimination or harassment, so long as Dr. Garlington provides only limited discussion of the information Williams provided her in order to establish the foundation for her opinions. Such testimony also would not lend much weight, if any, to the credibility of Williams' allegations. To the contrary, testimony that Williams exhibits symptoms of depression and anxiety is relevant to damages, and the jury can resolve whether such symptoms were caused by the alleged discrimination, dementia, or some other cause. Accordingly, limited testimony from Dr. Garlington as to the symptoms of depression, anxiety, somatization, and cognitive distortions that she observed in Williams is admissible so long as it does not include testimony that any such symptoms were trauma-related and so long as this Court determines that Dr. Garlington is qualified to serve as an expert in clinical psychology.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Preclude (ECF No. 77) is granted with the exception that Williams may proffer Dr. Garlington as a trial expert to testify about the symptoms of depression, anxiety, somatization, and cognitive distortion that she observed in the tests administered to Williams during her 2024 clinical examination. However, the Court reserves decision until a separate hearing or trial as to whether Dr. Garlington is qualified to serve as an expert in clinical psychology and the psychological effects of racial discrimination and harassment in the workplace. Williams is precluded from proffering any opinions from Dr. Garlington regarding her diagnosis of Williams with PTSD and MDD, the cause of the depression, anxiety, somatization, and cognitive distortion she found Williams to experience, and whether any symptoms she observed are related to trauma. To aid the parties in understanding what testimony is precluded, I have attached an annotated copy of Dr. Garlington's opinion, striking testimony that is precluded.

Dated: Central Islip, New York
    March 20, 2026

    /s/ Nusrat J. Choudhury
    NUSRAT J. CHOUDHURY
    United States District Judge

39